# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1069V
Filed: July 3, 2025

|   |   |
|---|---|
| TAIMUR SHAIKH,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Special Master Horner |

*Richard Gage, Richard Gage, P.C., Cheyenne, WY*, for petitioner.
*Emilie Williams, U.S. Department of Justice, Washington, DC*, for respondent.

## **FINDING OF FACT**[1]

On August 21, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he developed chronic migraine syndrome as the result of the measles-mumps-rubella ("MMR") vaccine that he received on August 24, 2017. (ECF No. 1.) On February 21, 2024, petitioner moved for a finding of fact that his symptoms following his MMR vaccination did not result from concussions he sustained pre-vaccination. (ECF No. 55.) However, respondent maintains that petitioner is effectively asking the Court to make a finding regarding of the cause of his post-vaccination symptoms, which amounts to a legal conclusion, rather than a finding of fact. (ECF No. 56, pp. 8-9.) In the alternative, petitioner requested that the Court make findings of fact regarding petitioner's prior concussions, the symptoms associated with those prior concussions, the duration of

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

1

petitioner's concussion symptoms, and the nature of the petitioner's post-vaccination symptoms, as well as any other issues of fact the Court feels appropriate. (ECF No. 57, pp. 2-3.)

This fact finding does not reach any conclusions regarding the cause of petitioner's post-vaccination symptoms or the relationship, if any, between these symptoms and any earlier symptoms attributed to petitioner's prior head injuries. Such determinations will require expert evidence. Instead, this fact finding clarifies the factual record relating to petitioner's history of head injuries, symptoms attributed thereto, and whether those symptoms persisted up to the time of the vaccination at issue in this case. Any expert opining in this case shall address the facts as I have found them herein.

## I. Procedural History

Petitioner, acting *pro se*, filed his petition on August 21, 2020. (ECF No. 1.) After retaining counsel (ECF No. 15), petitioner filed medical records between October of 2021 and January of 2022. (ECF Nos. 23, 28; Exs. 1, 3.) On July 12, 2022, respondent filed his Rule 4(c) Report recommending against compensation. (ECF No. 32.) Respondent argued that petitioner had failed to proffer sufficient evidence to demonstrate that his chronic migraine syndrome was caused-in-fact by the MMR vaccination at issue, noting that petitioner had not filed an expert report or affidavit to support his claim. (*Id.* at 1, 8-10.) Additionally, respondent indicated that there was preponderant evidence that petitioner's headaches were likely due to the multiple concussions that he sustained prior to vaccination. (*Id.* at 10-11.)

Based on the undersigned's review of respondent's report, petitioner was ordered to file an expert report and an affidavit responding to specific inquiries made in respondent's report regarding possible outstanding medical records. (Non-PDF Scheduling Order, filed July 15, 2022.) On December 8, 2022, petitioner filed his affidavit. (ECF No. 36; Ex. 4.) However, after filing a series of motions for extension of time to file his expert report (ECF Nos. 33-34, 37-38), petitioner filed a declaration and a motion for a fact hearing. (ECF Nos. 39-40; Ex. 5.) Petitioner requested the opportunity to explain his injury and argued that a fact ruling was "necessary for an expert to have the information needed in order to opine in this case." (ECF No. 40.) After respondent indicated that he did not intend to file a response, the undersigned granted petitioner's motion, and a hearing was scheduled for June of 2023. (ECF Nos. 41, 43.) Prior to the hearing, petitioner filed additional medical records. (ECF No. 44; Ex. 2.)

A one-day fact hearing took place via Zoom on June 8, 2023, at which petitioner was the only witness to testify. (ECF No. 43; *see* Transcript of Proceedings ("Tr."), at ECF No. 46.) After the hearing, petitioner filed updated medical records. (ECF Nos. 52, 54; Exs. 6-7.) On January 23, 2024, the undersigned ordered petitioner to file a motion for a finding of fact. (Non-PDF Scheduling Order, filed Jan. 23, 2024.) Petitioner filed his motion on February 21, 2024. (ECF No. 55.) On March 22, 2024, respondent filed

his response to petitioner's motion.  (ECF No. 56.)  Petitioner filed a reply brief on April 8, 2024.  (ECF No. 57.)

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record on the factual issues addressed herein and that it is therefore appropriate to resolve these issues on the existing record.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, petitioner's motion is now ripe for resolution.

### II.   Factual History[3]

On September 10, 2013, petitioner presented to Swedish Hospital Emergency Room.  (Ex. 6, p. 123.)  In documenting the reason for the encounter, petitioner's treating provider Ayesha Ali, M.D., noted that petitioner was struck accidentally by or against objects or persons while engaging in recreational sport without a subsequent fall.  (*Id.*)  Dr. Ali diagnosed petitioner with a "concussion with loss of consciousness." (*Id.*)  The record for this encounter is one-page and provides no other information.  (*See id.*)

On January 2, 2014, petitioner was seen by his primary care provider, Jalal Rais Dana, M.D., for a sick visit.  (Ex. 2, p. 15.)  In documenting petitioner's history, Dr. Dana noted petitioner "[w]as hit in the head in Sept. on rt. side of temple, Then again in Oct. in top of head in the Gym at school.  No dizziness, no vomiting.  Requests slip for school." (*Id.*)  However, petitioner testified that he was only hit in the head once during that timeframe.  (Tr. 18.)  He clarified that he told his primary care provider that the incident either took place in September or October as he could not remember the exact date of the injury, given that this appointment was several months after the fact.  (*Id.* at 18-19.)  Petitioner's neurological exam was normal, revealing no acute findings, deficits, or focalizing signs.  (Ex. 2, p. 15.)  Dr. Dana assessed petitioner with a concussion and headaches and referred petitioner to a neurologist.  (*Id.*)

At the fact hearing, petitioner recalled experiencing some lightheadedness that lingered for a week or two after getting hit in the head in gym class.  (Tr. 19.)  Petitioner explained that he got hit in the head while playing basketball and did not recall receiving any medical care on the day of the incident.  (*Id.* at 34, 40.)  He testified that his symptoms from that incident lasted "a month or so," and that they had mostly resolved by the time of his appointment with his primary care provider on January 2, 2014.  (*Id.* at 34-35.)  While petitioner reported the incident and his symptoms to Dr. Dana at that appointment, he stated that part of the reason for the visit was to obtain a doctor's note

---

[3] Although the medical records have been reviewed and considered in their entirety, only those relevant to this fact finding are discussed.  Additionally, this decision discusses only the testimony relevant to the factual issues addressed.

3

to excuse some his absences from school.  (*Id.* at 19-20, 35.)  Petitioner clarified that while he missed some school around the time following the gym class incident, those absences were more likely attributable to "a mood thing" that he was experiencing at that time.  (*Id.* at 41.)

On June 18, 2014, petitioner underwent an initial evaluation by neurologist Felise Zollman, M.D., with a chief complaint of "concussion."  (Ex. 6, pp. 109-22.)  Under history of present illness, Dr. Zollman documented that petitioner

> reports that, in Nov. '13 he experienced a blow to his head:  he collided with his brother.  He experienced headache, nausea, drowsiness and lack of focus.  These symptoms lasted for about 3 months.  He presented to his Pediatrician for evaluation after about 2 months . . . .  Since this event, the [petitioner] reports that he was hit in the head two more times in the interim, but he did not experience further concussion symptoms with these blows. . . . [petitioner] reports having had no prior concussion(s).

(*Id.* at 109-10.)  Dr. Zollman noted that petitioner experienced headaches while weightlifting and running during gym class and that these symptoms lasted through the end of May.  (*Id.* at 110.)  However, she remarked that school is now over, and petitioner's symptoms are now resolved.  (*Id.*)  Additionally, Dr. Zollman documented that petitioner reported that his grades suffered substantially after he sustained his concussion.  (*Id.*)

Dr. Zollman's physical examination of petitioner revealed full cervical range of motion "but with end range pain."  (Ex. 6, p. 111.)  Additionally, Dr. Zollman noted "tenderness to palpation of the sub-occipital and cervical paraspinal muscles" and that "palpation reproduces headache."  (*Id.*)  Petitioner also underwent a standardized assessment of concussion, and he received a normal score.  (*Id.* at 111-14.)  The assessment did not reveal any concerns with respect to petitioner's memory or issues with attention or concentration.  (*Id.* at 113.)  Dr. Zollman's clinical impression was that petitioner's concussion sustained in November of 2013 had fully resolved.  (*Id.* at 114.)  She noted that, while petitioner was no longer symptomatic, his reported sustained difficulty with school warrants further assessment.  (*Id.*)  Additionally, Dr. Zollman remarked that "while [petitioner's] headache symptoms have significantly improved, his exam does demonstrate residual cervical sprain/strain findings, and if unaddressed, his headaches may return once again with activity."  (*Id.*)  As a result, Dr. Zollman referred petitioner to physical therapy to address his residual cervical sprain/strain symptoms and for neuropsychological testing to determine if petitioner suffered any residual cognitive impairment.  (*Id.*)

Petitioner underwent an initial physical therapy evaluation for his neck pain on July 3, 2014.  (Ex. 6, pp. 100-03.)  In documenting the history of petitioner's neck pain, the treating physical therapist noted that "[t]he initial mechanism of injury involved a collision with his brother sustained while playing some basketball."  (*Id.* at 102.)  The

physical therapist recorded petitioner's neck pain beginning on November 4, 2013.  (*Id.*)  Petitioner attended two additional physical therapy sessions supplemented by an at-home exercise program before being discharged from physical therapy on July 16, 2014.  (*Id.* at 93-99.)

About two years later, on September 14, 2016, petitioner presented to a university-based primary care clinic complaining of a right-sided headache after bumping the right side of his forehead while riding a bus two days earlier.  (Ex. 3, p. 1.)  Immediately after the incident, petitioner noted that he felt dizzy but denied loss of consciousness.  (*Id.*)  He recalled experiencing lightheadedness and stated that he "was feeling a little out of it at the time . . . just not feeling right." (Tr. 20.)  Petitioner reported that his headaches began the day following the incident, rating the pain at 7/10.  (Ex. 3, p. 1.)  He also expressed experiencing difficulties concentrating on his schoolwork.  (*Id.*)  Notably, petitioner reported a history of a concussion in 2014.  (*Id.*)  During the hearing, petitioner clarified that this notation referenced the concussion he sustained as a result of hitting his head in gym class.  (Tr. 21-22.)

At this appointment, petitioner was examined by Michael Bell, D.O.  (Ex. 3, p. 2.)  While he noticed minimal tenderness around the right temporal region on palpation, Dr. Bell remarked that petitioner's neurological exam was "completely normal," without focal deficits, and revealed no apparent acute findings.  (*Id.*)  Dr. Bell's clinical impression was that petitioner was experiencing post-concussion cephalgia.  (*Id.*)  He recommended that petitioner use Tylenol for his pain and discomfort, which he informed petitioner should subside with time.  (*Id.*)  Dr. Bell advised petitioner that his difficulties with concentration and his memory would also take some time to subside.  (*Id.*)

Petitioner returned to Dr. Bell on September 29, 2016, seeking further treatment for his symptoms that resulted after hitting his head on the bus.  (Ex. 3, pp. 3-4; Tr. 22-23.)  He reported that he continued to experience headaches, noting "intermittent sharp pain in the back of his head" along the occipital region, as well as continued difficulties concentrating and memory problems.  (Ex. 3, p. 3.)  Dr. Bell remarked that these symptoms are not unusual for patients with post-concussion syndrome and may persist for several weeks but should subside with time.  (*Id.*)  However, petitioner also noted that "he has been stumbling" and feeling dizzy.  (*Id.*)  Additionally, he reported difficulty falling asleep and waking up.  (*Id.*)  Dr. Bell performed another neurological examination of petitioner, which was again normal and revealed no acute findings.  (*Id.* at 4.)  Petitioner requested an MRI, and despite a normal neurological exam, Dr. Bell opined that an MRI was warranted in light of petitioner's stumbling and dizziness.  (*Id.*)   While an MRI was ordered (*Id.*), petitioner did not file any records for any MRI completed in 2016.[4]  However, subsequent records indicate that the results were unremarkable.  (Ex. 1, p. 43; Ex. 3, p. 8.)

---

[4] In his Rule 4(c) Report, respondent noted that the results, if any, of the MRI Dr. Bell ordered on September 29, 2016, were never filed.  (ECF No. 32, p. 3 n.1.)  Accordingly, respondent requested that petitioner file the results of any MRI visit if one took place.  (*Id.*)  Following his review of respondent's

When asked during the hearing about his symptoms after hitting his head on the bus, petitioner characterized his headaches as an acute problem, noting that his head started to hurt almost immediately after the incident but that the severity of his headaches decreased with time. (Tr. 21, 24.) In addition to his headaches, petitioner recalled experiencing lightheadedness, nausea, dizziness, and just generally feeling off. (*Id.* at 21, 23.) He noted that his symptoms had a very strong impact right away, but that they tapered off and slowly started to subside over the course of a couple weeks. (*Id.* at 23-24.) During the hearing, petitioner testified that the headaches he experienced after the bus incident lasted for approximately a month-and-a-half and that his post-concussion syndrome had mostly resolved by October of 2016. (*Id.* at 23, 33-34.) Additionally, petitioner testified that the symptoms he experienced after hitting his head on the bus were the same as the symptoms he had following the gym class incident. (*Id.* at 22.) He stated that with both incidents, he "felt a little weird for a few weeks" and then was back to normal. (*Id.*)

On August 24, 2017, petitioner received the MMR vaccine at issue in this case. (Ex. 3, pp. 5-6.) Petitioner testified that the headaches and other concussion symptoms he experienced after hitting his head on the bus had resolved prior to 2017. (Tr. 33-34.)

On September 12, 2017, nineteen days post-vaccination, petitioner presented to a university-based acute care clinic with concerns that he was having an adverse reaction to the MMR vaccine. (Ex. 3, p. 8.) Petitioner reported that "[s]ince he got the vaccine 2 weeks ago he has felt very tired and felt lightheaded. He also feels his memory is not as good." (*Id.*) However, he denied fainting. (*Id.*) Additionally, petitioner expressed concerns over recent weight loss and reported feeling cold despite the absence of a fever. (*Id.*) He noted that he intermittently experiences difficulties hearing in his right ear but that the feeling resolves after a few seconds. (*Id.*)

Two days later, on September 14, 2017, petitioner presented to a university-based primary care clinic and was evaluated by Tiffany Rushing, APN. (Ex. 3, p. 10.) He reported experiencing fatigue around "6 p.m. every night" despite sleeping 8 hours and noted that he was only getting around 6 hours of sleep per night two months ago and felt fine. (*Id.*) Additionally, petitioner reported experiencing intermittent dizziness lasting anywhere from 10 seconds to 20 minutes. (*Id.*) He noted that the dizziness episodes were "random" and not always brought on by movement. (*Id.*) However, he again denied experiencing any loss of consciousness. (*Id.*) Petitioner also reported intermittent headaches localized to the frontal lobe, as well as experiencing "some shortness of breath at night, 2-3 days ago." (*Id.*) He stated that he first started

---

report, the undersigned ordered petitioner to file an affidavit indicating, among other things, whether he underwent an MRI on September 29, 2016. (Non-PDF Scheduling Order, filed July 15, 2022.) In his sworn statement, petitioner avers that he "did have an MRI on September 29, 2016 at Swedish Covenant Medical Center." (Ex. 4, ¶ 2.) However, petitioner never filed the medical records for that MRI. While petitioner did previously file records from Swedish Covenant Hospital for the period of August 25, 2014 through October 2, 2021, no records for an MRI completed on September 29, 2016, appear to be included within that record. (*See* Ex. 1.)

experiencing symptoms two to three weeks ago after he received his MMR vaccine. (*Id.*)

The following day, petitioner presented to his primary care provider for a sick visit. (Ex. 2, p. 7.) Petitioner reported that he received the MMR vaccination approximately three weeks ago and that "he developed headaches, dizziness, fatigue and shortness of breath at times" a few days after vaccination. (*Id.*) While his primary care provider noted that petitioner's symptoms "lasted for 2-3 weeks" (*Id.*), petitioner testified that he thinks that what the provider "meant to say was symptoms have been persistent for the last two to three weeks." (Tr. 11.)

Petitioner returned to Dr. Dana for a sick visit on January 4, 2018. (Ex. 2, p. 6.) In documenting petitioner's medical history, Dr. Dana recorded that petitioner suffered a concussion four years ago while playing basketball and experienced dizziness, headache, and nausea. (*Id.*) He also noted that "4 TO 5 MONTHS AGO HAD ANOTHER CONCUSSION, HIT HIS HEAD AND IS NOW HAVING HEADACHES AND PHOTOPHOBIA." (*Id.*) However, petitioner testified that the notation indicating that he sustained a concussion four to five months prior to the appointment was inaccurate. (Tr. 26-27.) He explained that, at this encounter, he reported receiving his MMR vaccination approximately four to five months ago and communicated the symptoms he started experiencing post-vaccination. (*Id.*) But he stressed that he did not sustain a concussion in 2017. (*Id.* at 27.) Petitioner averred that he has only had two concussions in his lifetime, one in 2014 and one in 2016. (*Id.*) He testified that he mentioned the 2016 bus incident at this encounter and stated that he believes that his primary care provider incorrectly construed that incident and his MMR vaccination as being one event. (*Id.* at 27-28.)

On January 12, 2018, petitioner presented to the emergency department complaining of headaches, head sensitivity, and multiple aches. (Ex. 1, pp. 51, 54.) The emergency department triage form indicates that petitioner stated, "he was playing football three months ago and hit head and that he has hit his head playing ball many times." (*Id.* at 54.) The emergency room nurse noted

> Pt [complains of] periods of facial numbness to right side of face, times when it is quiet he hears ringing in both ears, and pt feels "shaking on the inside, in my chest." Pt is noticeably anxious, continuously tapping feet, fidgeting with glasses, does not make any eye contact, mumbling answers. Pt states he has had three concussions in the last three years from sports. Pt had an MRI 2 years ago that was normal. . . . All neuro exam is normal, pt is moving extremities equal, ambulatory without difficulty, facial movements equal. Denies any other recent illness.

(*Id.* at 52.)

While at the emergency department, petitioner was also evaluated by Trevor Kuston, M.D. (Ex. 1, p. 43.) In recording the history of petitioner's symptoms, Dr. Kuston documented that petitioner

> states he has been having difficulty concentrating, intermittent facial numbness, and ringing in his ears. He reports that this has been ongoing for awhile, but he came in today because he felt that he was having tremors inside his body. . . . Mother at bedside states that they have an appointment with Dr. Park neurology in two months but decided to come early due to symptoms. [Petitioner] states that last concussion was about two months ago.

(*Id.*) Dr. Kuston consulted with Dr. Park who recommended a head CT as petitioner "had a new concussion in the past few months." However, petitioner declined the CT, as well as recommended bloodwork, and signed out against medical advice. (*Id.* at 47, 51.) Dr. Kuston documented his clinical impression as post-concussion syndrome. (*Id.* at 47.)

At the hearing, petitioner discussed his emergency department encounter on January 12, 2018, and testified to the inaccuracy of the treating providers' notations regarding his history of concussions and head injuries. (Tr. 28-30.) Petitioner again stressed that he has only sustained two concussions, one in 2014 and one in 2016. (*Id.* at 29.) He explained that, in reporting his medical history, he was describing three events: the gym class incident in 2014, the bus incident in 2016, and his MMR vaccination. (*Id.* at 30.) Petitioner stated that he feels the treating providers "melded the wording together" and incorrectly paraphrased his reported history. (*Id.*) Additionally, petitioner testified that he did not sustain any head injuries or concussions from sports, other than the gym class incident in 2014, and further noted that he "wasn't playing any sports" and that he "didn't play football." (*Id.* at 30, 34.)

On February 15, 2018, petitioner followed up with his primary care provider regarding headaches and dizziness, as well as low vitamin D levels. (Ex. 2, p. 5.) Dr. Dana noted that petitioner had been experiencing headaches and feeling dizzy ever since he hit his head on September 26, 2016. (*Id.*) However, in addition to noting that the date of the bus incident was incorrectly recorded, petitioner testified that his symptoms from the bus incident resolved after a month to a month-and-a-half. (Tr. 30-31, 33-34.) Petitioner stated that he thinks Dr. Dana was trying to indicate that he first felt those symptoms after the bus incident in 2016, rather than suggesting the symptoms never went away. (*Id.* at 31.) The diagnoses listed for the encounter include headache, vitamin D deficiency, and concussion. (Ex. 2, p. 5.) However, petitioner testified that he has only had two concussions in his lifetime, one from the gym class incident, and one from the bus incident, stressing that he never had a concussion in 2017 or beyond. (Tr. 21-22, 26-27, 30, 34.)

8

Petitioner was evaluated by neurologist Danny Park, M.D., on March 7, 2018. (Ex. 1, p. 3.) In documenting the history of petitioner's migraine headaches, Dr. Park recorded that

> Patient had the MMR vaccine last August. Immediately after the injection felt a burning sensation through his head that lasted about 5 minutes. Since then has had continued headaches, facial numbness, fatigue, tremors with numbness/tingling in his arms > legs. Initially had dizziness but that has improved. Headaches are described as right side pulsating with light/sound sensitivity and no nausea/vomiting. Usually occurs later in the day and lasts for about 2 hours. . . . Feels facial numbness mostly on the right side which is constant but the intensity changes. Has tremors in his arms > legs and feels it internally through his chest area. Has a history of concussion last September when he hit his head on a bus pole with no loss of consciousness. Had headaches and lack of concentration for about 2 months following.

(*Id.*) He noted that petitioner reported that all of his symptoms began after he received his MMR vaccination in August of 2017. (*Id.*)

On June 12, 2018, petitioner followed up with Dr. Park. (Ex. 1, p. 5.) Dr. Park noted that petitioner may have experienced some improvement in his symptoms with the facial numbness and tingling and numbness in his legs subsiding. (*Id.*) Petitioner reported experiencing 4-5 headaches per week, dizziness, and constant fatigue. (*Id.*) Additionally, petitioner reported that he had not been able to go to school due to his symptoms. (*Id.*)

One month later, petitioner was evaluated by primary care provider Celia Lipinski, D.O. (Ex. 7, pp. 3, 6.) Petitioner reported that he had a dizzy spell two days prior, as well as recurring headaches. (*Id.* at 3.) On January 16, 2019, petitioner followed up with Dr. Lipinski for his annual exam. (*Id.* at 9.) At this encounter, Dr. Lipinski noted that petitioner reported "an intermittent headache on the right side of his head and behind his eyes. Sometimes his headaches are accompanied with facial numbness. These headaches are frequent: every other day. He admits to sleeping no more than 5 hours a night. He is always tired." (*Id.* at 18.)

On February 5, 2019, petitioner followed up with Dr. Park. (Ex. 1, p. 7.) Petitioner reported that he continued to have headaches 3-4 times per week, as well as facial numbness "that does not correlate with the headaches." (*Id.*)

On April 11, 2019, petitioner established care with a new neurologist, Irene Semenov, D.O. (Ex. 6, p. 62.) Petitioner reported that his symptoms first started in 2017 after he got the MMR vaccine and that he experiences more than three headaches per week. (*Id.* at 62, 66.) Additionally, petitioner noted that his headaches are bilateral in distribution, localized to the frontal region, last anywhere from one to four hours, and are triggered or exacerbated with concentration, routine physical activity,

9

and exercise.  (*Id.* at 62-63.)  He rated the severity of his headaches as a 7/10 and noted associated symptoms including dizziness, sensitivity to light, sensitivity to noise, and nausea.  (*Id.* at 62.)  Under review of systems, Dr. Semenov documented that petitioner was positive for tinnitus, photophobia, eye pain, tingling, tremors, and weakness.  (*Id.* at 66.)

Petitioner followed up with Dr. Semenov three times during the remainder of 2019 through April of 2020.  (Ex. 6, pp. 31-30.)  During that time, petitioner continued to complain of headaches, facial numbness, tinnitus, fatigue, dizziness, and sensitivity to light.  (*Id.* at 32, 42, 50.)  Petitioner testified that he still experiences his post-vaccination symptoms, including chronic migraines and tinnitus.  (Tr. 32.)

### III.    Party Contentions

Petitioner urges that,

> [l]ike many young people, [he] suffered a few concussions in his teens. Each time, however, the symptoms resolved within a month or two.  He was symptom free when he received an MMR vaccination in August, 2017.  After the vaccination, [he] began to develop symptoms that were completely new. Even the headache he developed had a different quality to it.

(ECF No. 55, p. 6.)

However, respondent is critical of petitioner's motion because he concludes that petitioner is seeking a legal conclusion, rather than a fact finding.  (ECF No. 56, pp. 8-9.)  He stresses the need to defer any fact finding as to causation until expert medical opinion has been provided.  (*Id.*)  To the extent petitioner's motion does encompass requests fairly characterized as fact finding, respondent's motion response does not urge any particular finding of fact relative to any issue.  In his prior Rule 4 Report, however, respondent argued that

> petitioner consistently reported to his treating physicians that he experienced multiple concussions in the years prior to vaccination, and that he suffered from headaches, dizziness, and concentration issues, all predating the vaccination at issue.  Thus, there is strong evidence that petitioner's headaches were unrelated to his MMR vaccination and instead resulted from his concussions.

(ECF No. 32, p. 11 (internal citations omitted).)

In his reply, petitioner contended that, even accepting respondent's position regarding the appropriate scope of his motion,

> there are still issues of fact this Court can determine to help guide any expert hired to opine on causation.  For instance, it would be helpful for this Court to determine if [petitioner] credibly testified that he was symptom free for at

10

least nine months prior to vaccination and that the symptoms post-vaccination were different from post-concussion symptoms.

(ECF No. 57, p. 2.)

## IV. Legal Standard

Pursuant to the Vaccine Act, a petitioner must prove their claim by a preponderance of the evidence.  § 300aa-13(a)(1)(A).  The role of a special master is not to diagnose injuries, but rather "to determine 'based on the record evidence as a whole and the totality of the case'" whether petitioner has established their claim by a preponderance of the evidence.  *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (quoting *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)).   While a special master must consider the record as a whole, they are not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record.  § 300aa-13(b)(1).

The Federal Circuit has held that contemporaneous medical records are ordinarily to be afforded significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate a diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony – especially where such testimony conflicts with the record evidence.  *Cucuras*, 993 F.2d at 1528 (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947)).  However, this rule is not absolute.  Afterall, "[m]edical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).

There are situations in which compelling oral testimony may be more persuasive than written records, such as where the records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based on common sense and experience, this rule should not be treated as an absolute yield where the factual predicates for its application are weak or lacking.").  When witness testimony is offered to overcome the weight afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling."  *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  Further, the special master must

consider the credibility of the individual offering the testimony. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

In determining whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, there must be evidence that this decision was the result of a rational determination. *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 416-17 (Fed. Cir. 1993). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (quoting Vaccine Rule 8) (citing § 300aa-12(d)(3)), *aff'd sub nom. LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 416-17.

## V. Discussion

In this case, respondent is correct in maintaining that petitioner's request for a finding of fact regarding the relationship, or lack thereof, between his post-vaccination symptoms and his prior symptoms, amounts to a legal conclusion regarding causation. Such a determination would be premature at this juncture, and the undersigned will not make any conclusions about the cause of petitioner's post-vaccination symptoms until both parties have been afforded the opportunity to file medical expert opinions addressing those issues. However, as petitioner points out, there is value in clarifying the facts surrounding petitioner's history of prior head injuries in order to facilitate expert review.

### a. Petitioner's history of diagnosed concussions

There is preponderant evidence that petitioner was twice diagnosed with concussions, once in the fall of 2013 after getting hit in the head while playing basketball in gym class, and once in September of 2016 after hitting his head while riding the bus. However, there is insufficient evidence that petitioner sustained any additional concussions. In particular, there is not preponderant evidence that petitioner sustained a concussion in 2017.

#### i. 2013

Medical records for various encounters consistently indicate that petitioner sustained a concussion after hitting his head in the fall of 2013. (Ex. 2, p. 15; Ex. 6, pp. 109-10, 123.) However, the month in which this injury occurred is not consistently documented. Some records suggest that petitioner suffered the concussion in September or October of 2013 (Ex. 2, p. 15; Ex. 6, p. 123), while others indicate the injury occurred in November of 2013 (Ex. 6, pp. 109-10). Additionally, the manner by which petitioner sustained the concussion is not documented identically within the relevant medical records. Some records indicate that petitioner got hit in the head during gym class (Ex. 2, p. 15), while other records note a collision or hit to the head

12

while playing basketball or some form of recreational sport (Ex. 2, p. 6; Ex. 6, pp. 100-02, 109-10, 123).

At the hearing, petitioner repeatedly testified that he had a concussion in 2014. (Tr. 21-22, 27, 29-30, 34.) However, this seems to reference his medical encounter of January 2, 2014, where his primary care provider diagnosed him with a concussion. (*Id.* at 17-20 (discussing Ex. 2, p. 15).) He testified that the incident leading to that concussion occurred in either September or October, a couple months prior to his primary care visit in January of 2014. (*Id.* at 18-19.) Therefore, petitioner's testimony about sustaining a concussion from a hit to the head that occurred in the fall of 2013 is consistent with the documentation in the medical records.

While some of the medical records indicate that petitioner suffered multiple blows to the head between the fall of 2013 and 2014 (Ex. 2, p. 15; Ex. 6, pp. 109-10), petitioner testified to the inaccuracy of some of these notations (Tr. 17-19 (discussing Ex. 2, p. 15)). Regarding the notation in his January 2, 2014 encounter suggesting that petitioner was hit in the head twice in the fall of 2013 (Ex. 2, p. 15), petitioner persuasively explained that he believes the error was a result of his report that the gym class incident occurred in either September or October of 2013.[5] (Tr. 17-19.) Although the month in which the injury occurred is not consistently documented within the medical records, this discrepancy does not warrant the conclusion that petitioner sustained multiple concussions during that time frame. Many of these encounters took place in 2014, several months after the injury (Ex. 2, p. 15; Ex. 6, pp. 100-02, 109-10), and petitioner testified that he could not remember the exact date of the incident at the time of these visits, and therefore reported an approximate onset of the injury to his treating providers (Tr. 18-19 (discussing Ex. 2, p. 15)). The fact that the medical records include varying explanations on how petitioner sustained his injury is also insufficient to warrant a finding that these records relate to different concussions experienced by petitioner in the fall of 2013. The different notations in the medical records regarding the mechanism of injury are not incompatible with one another. Petitioner testified that he sustained the concussion after getting hit in the head while playing basketball in gym class in the fall of 2013 (Tr. 17-19, 34), which is an explanation consistent with all the varying notations indicating the mechanism of injury was a collision experienced during recreation (Ex. 2, pp. 6, 15; Ex. 6, pp. 100-02, 109-10, 123).

Therefore, considering the relevant medical records and petitioner's testimony, I find that there is insufficient evidence to conclude that petitioner sustained more than one head injury during the fall of 2013 through 2014. Instead, I conclude that there is

---

[5] Moreover, even if petitioner did experience additional hits to the head during this timeframe, nothing in the medical records supports a conclusion that he sustained multiple concussions as a result. In fact, a record for an encounter on June 18, 2014, which indicated petitioner experienced subsequent blows to the head, notes that "he did not experience further concussion symptoms with these blows." (Ex. 6, pp. 109-10.)

13

preponderant evidence that petitioner suffered a single head injury, diagnosed as a concussion, in the fall of 2013.

### ii.   2016

On September 14, 2016, two days after hitting his head on the bus, petitioner presented to a university clinic for care, reported the incident, and was diagnosed with post-concussion syndrome. (Ex. 3, pp. 1-2.) When petitioner returned for care on September 29, 2016, he again reported that he hit his head while riding the bus on September 12, 2016. (*Id.* at 3.) At this encounter, petitioner's treating provider documented a clinical assessment of "post-concussion syndrome." (*Id.* at 4.)

Petitioner's testimony was consistent with the information reflected in the medical records for these treatment encounters. At the hearing, petitioner clearly and repeatedly stated that he hit his head while riding the bus in September of 2016 and was diagnosed with a concussion as a result of the incident. (Tr. 20-21, 23-24.) Therefore, I find that there is preponderant evidence that petitioner suffered a head injury, diagnosed as a concussion, in September of 2016.

### iii.   2017

Several notations in various medical records suggest that petitioner may have sustained a concussion in 2017. However, I find that these notations are insufficient to warrant a conclusion that petitioner suffered an additional concussion in 2017.

In the medical record for the encounter on January 4, 2018, petitioner's primary care physician, Dr. Dana, documented that petitioner had a history of two concussions, with the first one occurring four years ago while playing basketball and the second one occurring "4 TO 5 MONTHS AGO" after he hit his head. (Ex. 2, p. 6.) As a result, this notation suggests that petitioner sustained a concussion in August or September of 2017. However, during the hearing, petitioner explained that he believes that his primary care provider incorrectly construed that incident and his MMR vaccination as being one event. Petitioner had presented to his primary care provider, and was evaluated by an advanced practice nurse, on September 15, 2017, approximately four months prior to his encounter with Dr. Dana. (Ex. 2, p. 7.) That record makes no reference to a recently sustained concussion, nor was petitioner diagnosed with a concussion during that visit. (*See id.*) Rather, the documentation from petitioner's primary care encounter on September 15, 2017, focuses solely on the symptoms petitioner reported experiencing after receiving the vaccination at issue. (*Id.*)

Petitioner's medical record for his emergency room encounter on January 12, 2018, includes various notations suggesting that petitioner sustained a concussion in 2017. (Ex. 1, pp. 43-54.) However, these notations, while not per se inconsistent, include somewhat different narratives about petitioner's history of concussions and head injuries, which cuts against the reliability of these records with respect to petitioner's history of concussions. Petitioner repeatedly testified that he has only sustained two concussions and that he did not sustain any concussions in 2017. (Tr.

14

20-21, 23-24, 27, 29-31.)  He persuasively testified that in reporting his medical history at this encounter, he was describing three events:  the gym incident, the bus incident, and the vaccine in 2017.  He reasoned that the providers erroneously "melded the wording together."  (*Id.* at 30.)  While the treating physician at this encounter documented a clinical impression of post-concussion syndrome, this assessment was at least in part based on the physician's understanding that petitioner was diagnosed with a concussion two months prior to the encounter.  (Ex. 1, pp. 43, 47.)  Critically, however, the treating physician documented that he consulted with Dr. Park about petitioner's most recent concussion and his clinical assessment.  (*Id.* at 47.)  Yet the medical record for petitioner's neurology encounter with Dr. Park on March 7, 2018, notes only that petitioner had a history of concussion relative to "when he hit his head on a bus pole."  (Ex. 1, p. 3.)  Although Dr. Park indicated this had occurred "last September," as discussed in the preceding section, the contemporaneous medical records place this incident in 2016, rather than 2017.  Moreover, consistent with petitioner's testimony, the record clearly indicates that petitioner was referred to Dr. Park for symptoms petitioner reported experiencing after he received his MMR vaccination at issue, not for evaluation of a recent concussion.  (*Id.*)  There is no record for any medical encounter at which petitioner was diagnosed with a concussion in or around November of 2017.

In sum, while there are various notations in the medical records suggesting that petitioner suffered a concussion in 2017, these notations are themselves inconsistent and are insufficient to warrant a finding that petitioner sustained an additional concussion in 2017.  Therefore, I find that petitioner has a history of two head injuries, both diagnosed as concussions:  one in the fall of 2013, as the result of hitting his head while playing basketball in gym class, and one in September of 2016, as the result of hitting his head on the bus.

### b. Character and duration of the symptoms following the concussion diagnosed in the fall of 2013

Petitioner's testimony regarding the symptoms that he developed after his first concussion is generally consistent with the symptoms documented by petitioner's treating providers.  Accordingly, I find that there is preponderant evidence that petitioner experienced headaches, lightheadedness, nausea, drowsiness, and difficulty focusing in the fall of 2013 after hitting his head while playing basketball in gym class.

While petitioner testified that he believed all the symptoms he experienced after the gym class incident resolved after "a month or so" (Tr. 35), some notations in his medical records suggest that his symptoms persisted for a longer duration of time.  (Ex. 2, p. 15; Ex. 6, p. 110.)  When petitioner reported the incident to his primary care provider in January of 2014, his primary care provider assessed petitioner with a concussion and headaches and referred him to a neurologist.  (Ex. 2, p. 15.)  These notations suggest that petitioner was still experiencing some of his concussion symptoms, specifically headaches, at the time of this encounter.  Moreover, when petitioner underwent a neurology evaluation in June of 2014, the neurologist

15

documented that petitioner sustained a concussion in fall of 2013 and that his symptoms persisted for approximately three months. (Ex. 6, pp. 109-10.) The neurologist also noted that petitioner continued to experience headaches with physical activity during gym class through May of 2014, although it is unclear whether the neurologist attributed petitioner's continued headaches to his concussion or petitioner's residual cervical sprain/strain revealed upon physical examination. (*Id.* at 110, 114.) Additionally, the neurologist indicated that petitioner reported that the academic difficulties he first experienced after sustaining his concussion in the fall of 2013 continued through the remainder of the 2013-2014 school year. (*Id.* at 110.) However, the neurologist documented that, at the time of the exam, petitioner was asymptomatic and that his concussion from the fall of 2013 had fully resolved. (*Id.* at 114.)

Petitioner's testimony about the duration of the symptoms he experienced after sustaining a concussion in the fall of 2013 was vague and not compelling. Moreover, the fact that petitioner sought medical care several months after the incident, specifically an evaluation by a neurologist, cuts against his recollection of his symptoms resolving after a month. While petitioner testified that the primary purpose of his medical encounter in January of 2014 was to obtain a doctor's note to excuse school absences, his primary care provider nonetheless concluded that his clinical presentation warranted a referral to neurology for an evaluation.[6] Therefore, I find the documentation in the medical records more reliable with respect to the duration of petitioner's symptoms.

Considering the record as a whole, I find that all of the symptoms that petitioner experienced after hitting his head in the fall of 2013 resolved by June of 2014.

### c. Character and duration of the symptoms following the concussion diagnosed in September 2016

While petitioner's testimony about his concussion in September of 2016 only addressed some of the symptoms documented in the medical records, his testimony was generally consistent with the medical records as far as it went. Accordingly, I find that there is preponderant evidence that petitioner experienced headaches, dizziness, nausea, trouble falling asleep and waking up, changes in coordination such as stumbling, and difficulties with concentration and memory in September of 2016 after hitting his head while riding the bus.

At the hearing, petitioner stated that his post-concussion syndrome started to resolve by October of 2016. (Tr. 23.) He testified that he recalled all of his symptoms from his concussion in 2016 lasting for a month to a month-and-a-half. (*Id.* at 33.) When specifically asked about the headaches he experienced with his concussion in

---

[6] To the extent petitioner's testimony could be interpreted as implying that his symptoms at that time were attributable to a mood disorder, rather than his diagnosed concussion, his belief as to the cause or medical diagnosis of his symptoms is beyond his competency as a lay witness. *James-Cornelius ex rel. E.J. v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021).

2016, petitioner averred that his headaches stopped prior to 2017 and that he had "returned to normal" by 2017.  (*Id.* at 33-34.)

In contrast to petitioner's concussion in the fall of 2013, there are no medical records that specifically address when petitioner's 2016 concussion resolved.  While the medical record for petitioner's primary care encounter on February 15, 2018, includes a notation that suggests petitioner's concussion symptoms, specifically his headaches and dizziness, persisted from September of 2016 through the date of the encounter (Ex. 2, p. 5), I afford this record little weight as evidence of the duration of petitioner's 2016 concussion symptoms.  Petitioner did not seek care for the symptoms he experienced after hitting his head on the bus after September 29, 2016.  Thus, there are no medical records that support this notation that suggests petitioner's headaches and dizziness from his 2016 concussion persisted through February of 2018.  Lastly, at this encounter on February 15, 2018, petitioner's primary care provider referred petitioner to neurology.  (Ex. 2, p. 5.)  When petitioner then presented for his initial neurology evaluation less than a month later, Dr. Park noted petitioner's history of the concussion he sustained from the bus incident but recorded that petitioner's concussion symptoms, specifically his headaches and loss of concentration, lasted about two months.  (*See* Ex. 1, pp. 3-4.)  Moreover, the records for petitioner's encounters with Dr. Park list petitioner's chronic symptoms that he experienced post-vaccination as the reason for the referral to neurology.  (*Id.* at 6, 8.)  Therefore, I afford the medical record for petitioner's primary care encounter on February 15, 2018, little weight as evidence of the duration of petitioner's 2016 concussion symptoms.

Considering the record as a whole, I find that the symptoms that petitioner experienced after hitting his head in September of 2016 resolved by no later than January of 2017.  Accordingly, there is not preponderant evidence that petitioner was experiencing these symptoms at the time he received the vaccination at issue on August 24, 2017.

### VI.  Conclusion

For all the reasons discussed above, and considering the record as a whole, I conclude that the record evidence preponderates in favor of the following findings:

- Petitioner has a history of two head injuries, both diagnosed as concussions, one in the fall of 2013 and one in September of 2016.  There is insufficient evidence to conclude that petitioner suffered any additional concussions at any time.

- Petitioner's first diagnosed concussion occurred in the fall of 2013, after he hit his head while playing basketball in gym class.  Following this incident, petitioner experienced headaches, lightheadedness, nausea, drowsiness, and difficulty focusing.  These symptoms resolved by June of 2014.

- Petitioner's second diagnosed concussion occurred in September of 2016, after he hit his head while riding the bus. Following this incident, petitioner experienced headaches, dizziness, nausea, trouble falling asleep and waking up, changes in coordination such as stumbling, and difficulties with concentration and memory. These symptoms resolved by January of 2017.

- This finding of fact does not address whether the diagnosis of concussion was correct on either occasion, whether the above-discussed symptoms were properly attributed to concussion, or whether concussion is the complete explanation for the symptoms. (For example, the above-discussed medical records raise a question as to whether petitioner's headaches may have been related to his cervical spine.)

- Petitioner was not experiencing the above-discussed symptoms from January of 2017 through the time of the MMR vaccination at issue.

Having established these facts as preponderantly supported, the parties may now engage experts to analyze petitioner's allegation of a vaccine-related injury. The experts are free to opine as to the medical significance of any aspect of petitioner's history; however, they must render their opinions based on petitioner's history as determined by undersigned's resolution of the facts vis-à-vis the number and timing of the diagnosed concussions as well as the identification and duration of the ensuing symptoms. Expert opinions seeking to rely on factual assumptions that are not preponderantly supported are unlikely to be credited.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master
